FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

2016 MAR 28  PM 3: 11

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

| | |
|---|---|
| ROBERT RUSSELL, individually and on behalf of all others similarly situated, | CASE NO. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| 21st CENTURY ONCOLOGY HOLDINGS, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

2:16-cv-242-RtM 38Meh

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................... 1

II.     NATURE OF THE ACTION .................................................................. 1

III.    JURISDICTION ...................................................................................... 5

IV.     PARTIES ................................................................................................. 6

    A.      Plaintiff Robert Russell .................................................................. 6

    B.      Defendant 21st Century Oncology Holdings, Inc. .......................... 6

V.      FACTUAL ALLEGATIONS ................................................................... 7

    A.      The Data Breach and 21st Century's Insufficient and Delayed
        Response .......................................................................................... 7

    B.      21st Century's Acknowledged Duty to Keep PII Private .................. 9

    C.      21st Century's Knowledge that Thieves Seek the PII Entrusted to It .... 9

        1.      The 2011-2012 Patient PII Data Breach ................................... 9

        2.      The increased threat to healthcare companies ........................ 10

        3.      The FBI's highly publicized warning to healthcare companies.............. 10

    D.      21st Century's Marked History of Prioritizing Profit Over Patients .................. 11

        1.      The 2008-2012 unnecessary testing of patients ..................... 12

        2.      The 2009-2015 additional unnecessary testing of patients .................... 13

        3.      21st Century Scuttles Its December 10, 2013 Confidential
            Initial Public Offering ............................................................. 14

    E.      21st Century's Continued Prioritization of Profits Over Patients
        Injures Data Breach Victims ............................................................ 16

        1.      The obfuscation of key facts about the Data Breach .............. 16

        2.      The risk of identity theft is a major concern to Data Breach
            victims.................................................................................... 17

        3.      The offered "remedy" is inadequate ...................................... 18

            a.      The offered remedies have required Data Breach
                victims to expend ongoing precious time containing
                their compromised PII............................................... 18

i

        b.    Thieves will likely use Data Breach victim's PII to hurt them far longer than a year ......................................................... 20

            (i)    Compromised Social Security numbers have long-term value to thieves and long-term consequences to Data Breach victims............................ 21

            (ii)   Compromised medical information has even greater long-term value to thieves and consequences to Data Breach victims............................ 21

    4.    The delayed disclosure further harmed Data Breach victims ................ 23

F.    21st Century's Priorities Have Caused Plaintiff's Most Sensitive PII to Be Compromised, Increasing His Current and Ongoing Suffering ................... 25

VI.    CLASS ACTION ALLEGATIONS ............................................................. 26

VII.    CAUSES OF ACTION .................................................................................. 28

    COUNT I: Negligence ................................................................................... 28

    COUNT II: Breach of Implied Covenant of Good Faith and Fair Dealing ................... 35

    COUNT III Violation of Florida Deceptive and Unfair Trade Practices Act Fla. Stat. §501.201, *et seq.* ................................................................... 37

    COUNT IV Declaratory Judgment ............................................................... 39

    COUNT V: Unjust Enrichment ..................................................................... 41

VIII.    PRAYER FOR RELIEF ............................................................................ 42

IX.    JURY TRIAL DEMANDED ....................................................................... 42

## I. INTRODUCTION

Plaintiff Robert Russell, individually and on behalf of all others similarly situated, files this Class Action Complaint against 21st Century Oncology Holdings, Inc. ("Defendant" or "21st Century"), and alleges as follows based on personal knowledge, the investigation of his counsel, and information and belief.

## II. NATURE OF THE ACTION

1. As any oncology patient, survivor, or loved one can attest—and 21st Century Oncology recognizes on its website[1]—medical challenges are stressful and difficult and a cancer diagnosis can seem to put one's life out of control:



2. The last thing patients dealing with potentially deadly illnesses need is further harm and stress caused by the insecurity of their most private data and how it may be used by thieves.

---

[1] 21st Century, *What to Expect as a Cancer Patient*, available at https://www.21co.com/radiation-therapy/what-to-expect (last visited Mar. 18, 2016).

3.      But that is exactly what victims of the 21st Century Oncology data breach are enduring nationwide.  Millions of 21st Century data breach victims have lost control of sensitive information that endangers their financial, medical, and emotional well-being for the rest of their already-burdened lives.

4.      While more than 2.2 million 21st Century Oncology victims have sought out and/or paid for medical care from the company, thieves have been hard at work, stealing and using their hard-to-change Social Security numbers and highly sensitive medical information for more than five months without their knowledge.  21st Century's lax security practices allowing this intrusion, have worsened victims' already life-altering circumstances by, among other injuries: (a) adding to their already heightened financial obligations by placing them at increased risk of fraudulent charges; and/or (b) complicating diagnosis, prognosis, and treatment for their severe medical conditions by placing them at increased risk of having inaccurate medical information in their files.

5.      On or around October 3, 2015, thieves hacked into 21st Century Oncology's provider database; however, 21st Century Oncology apparently failed to detect the data breach until the Federal Bureau of Investigation ("FBI") notified it of the massive breach more than a month later, on November 13, 2015 (the "Data Breach").[2]

6.      The Data Breach resulted in the disclosure of private and highly sensitive information including: names; Social Security numbers; physician's names; medical diagnoses; treatment information; and insurance information ("PII").[3]

---

[2] 21st Century, *Notice to Patients Regarding Security Incident* (Mar. 4, 2016), *available at* https://www.21co.com/securityincident (last visited Mar. 18, 2016).

[3] *Id.*

7.      Making matters worse, 21st Century Oncology is not a name known to all Data Breach victims.  In fact, some Data Breach victims were shocked and alarmed to learn that 21st Century Oncology had access to their PII at all, much less had lost control of their PII and allowed it to be compromised by an unauthorized third party who could further distribute their private and sensitive PII to anyone and everyone, including identity thieves.

8.      Indeed, 21st Century has acknowledged in the Notice of Privacy Practices that is posted on its website that it is "required by law to maintain the privacy of your protected health information, to provide you with notice of our legal duties and privacy practices with respect to that protected health information, and to notify any affected individuals following a breach of any unsecured protected health information."[4] It also represented that it would abide by these obligations.  21st Century failed to live up to its own promises, much less those required by law.

9.      Contrary to its promises to help patients improve the quality of their lives through secure data practices, 21st Century's conduct has instead been a direct cause of the ongoing harm to these Data Breach victims whose current suffering has been magnified by the Data Breach, and who will continue to experience harm and data insecurity for the indefinite future.

10.     Specifically, 21st Century failed to maintain reasonable and/or adequate security measures to protect Data Breach victims' PII from unauthorized access and disclosure, apparently lacking, at a minimum: (1) security measures designed to prevent this

---

[4] 21st Century, *Notice of Privacy Practices* (Mar. 26, 2013), available at https://www.21.co.com/~/media/files/revised%20npp%npp%20for%2021c%20web%20site.pdf (last accessed Mar. 18, 2016).

3

attack even though 21st Century has suffered from at least one previous data breach, and knew or should have known that it was a prized target for hackers; and (2) security protocols to promptly detect the breach and removal of data from its provider database pertaining to 2.2 million 21st Century Data Breach victims.

11.     Moreover, while 21st Century has reportedly had months to figure out how to protect and minimize harm to victims of the Data Breach, its response has been slapdash and ineffective.  First, 21st Century harmed victims through delayed notification.  Adding insult to injury, it then offered only one year of credit monitoring and identity theft insurance, which is wholly insufficient.  Credit monitoring and identity theft insurance do not protect against identity theft.  Rather, they force Data Breach victims first to actually experience the stress of theft, and then to spend the time to undo financial injury inflicted by identity thieves who seek to use their compromised PII for financial gain.

12.     In addition, credit monitoring fails to remedy the potentially life-threatening injury to Data Breach victims inflicted by identity thieves who seek to use the victims' compromised information to obtain medical care, thereby placing the thieves' inaccurate information on innocent victims' medical records in the process.  This harm is particularly dangerous for oncology patients.

13.     Furthermore, thieves with access to Data Breach victims' compromised PII can use their Social Security numbers indefinitely because, unlike credit and financial accounts, these numbers are difficult to change.  In addition, medical identity theft can continue to harm Data Breach victims indefinitely because this information is often shared amongst numerous providers.

4

14. Plaintiff is a Data Breach victim and brings this proposed class action lawsuit on behalf of himself and all other persons whose PII has been compromised as a result of the Data Breach. He seeks injunctive relief requiring 21st Century Oncology to implement and maintain security practices to comply with regulations designed to prevent and remedy these and other potential data breaches, as well as restitution, damages, and other relief as the Court may order. Plaintiff and other Data Breach victims will have to remain vigilant for the rest of their lives to combat potential identity theft. Despite all best efforts of Plaintiff, other Data Breach victims, or anyone else, this most sensitive personal data can never be made private again.

## III. JURISDICTION

15. This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5 million, exclusive of interest and costs, Defendant does business nationwide in 17 states, and members of the proposed class are citizens of different states than Defendant 21st Century.

16. This Court has personal jurisdiction over 21st Century because 21st Century maintains its headquarters and principal executive and administrative offices in Florida and it has sufficient minimum contacts with Florida.

17. Venue is proper in this district under 28 U.S.C. § 1391(b) because 21st Century resides in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## IV.  PARTIES

**A.  Plaintiff Robert Russell**

18.  Plaintiff Robert Russell is a citizen and resident of Arizona.

19.  Plaintiff has received medical care and directly and/or indirectly paid for it.  In addition, Plaintiff will continue to receive ongoing medical care and directly and/or indirectly pay for it.

20.  On information and belief, some of Plaintiff's medical care has been provided by one or more employees and/or affiliates of 21st Century Oncology Holdings, Inc. and/or its wholly-owned subsidiaries.

21.  In March 2016, Plaintiff received a notification from 21st Century Oncology Holdings, Inc. that his private and sensitive PII was compromised due to the Data Breach. He has been injured as a result.

**B.  Defendant 21st Century Oncology Holdings, Inc.**

22.  Defendant 21st Century Oncology Holdings, Inc. is a corporation organized under the laws of Delaware and maintains its principal executive and administrative offices in Fort Myers, Florida.  Defendant, through its wholly-owned subsidiaries, is a leading global, physician-led provider of integrated cancer care services.

23.  Defendant provides a full spectrum of cancer care services by employing and affiliating with physicians in their related specialties, which enables Defendant to collaborate across its physician base, integrate services and payments for related medical needs, and to disseminate its medical practices on a broad scale.

24.     Defendant operates the largest integrated network of cancer treatment centers
and affiliated physicians in the world.  As of December 31, 2014, the 21st Century network
was comprised of approximately 794 community-based physicians in the fields of radiation
oncology, medical oncology, breast, gynecological and general surgery, urology and primary
care.

25.     Defendant's cancer treatment centers in the United States are operated
predominantly under the *21st Century Oncology* brand and are present in 17 states: Alabama,
Arizona, California, Florida, Indiana, Kentucky, Maryland, Massachusetts, Michigan,
Nevada, New Jersey, New York, North Carolina, Rhode Island, South Carolina, Washington
and West Virginia.

## V.     FACTUAL ALLEGATIONS

### A.     The Data Breach and 21st Century's Insufficient and Delayed Response

26.     On November 13, 2015, the FBI advised 21st Century that "patient
information was illegally obtained by a third party may have gained access to a 21st Century
database."[5]  According to Defendant, once it was informed of the breach, it hired a leading
forensics firm to aid in the investigation as well as "assess their systems and bolster
security."[6]  As a result of that investigation, Defendant determined that the intruder may have
accessed the database on October 3, 2015, nearly **six weeks** prior to 21st Century even

---

[5] 21st Century, *Letter to Office of the Attorney General of New Hampshire* (March 4, 2016), available at
http://doj.nh.gov/consumer/security-breaches/documents/21st-century-oncology-20160304.pdf (last visited
Mar. 18, 2018), attached as exhibit A.

[6] *Id.*

becoming aware of the intrusion, and **five months** prior to the Data Breach victims'
knowledge.

27.     The PII accessed included highly sensitive information such as names, Social
Security numbers, physicians' names, diagnoses and treatment information, as well as
insurance information.

28.     On March 4, 2016, 21st Century filed a United States Securities and Exchange
Commission ("SEC") Form 8-K[7] that first publicly disclosed the intrusion into its database
that occurred five months prior, stating:

> The FBI asked that 21st Century delay notification or public announcement of the
> incident until today so as to not interfere with its investigation.  Now that law
> enforcement's request for delay has ended, the company is notifying patients as
> quickly as possible.

29.     As explained further below, 21st Century is promising Data Breach victims—
as it has done in the past—that it will implement additional security measures and internal
security protocols to help prevent similar instances in the future.  It is also offering, as it has
done in the past, one year of credit monitoring.

30.     However, 21st Century is not learning from past mistakes and its offer for one
year of monitoring and identity theft insurance is woefully insufficient given the nature of the
PII accessed.

---

[7] 21st Century SEC Form 8-K (Mar. 4, 2016), available at https://www.21co.com/investors/sec-filings (last
visited Mar. 18, 2016).

**B.      21st Century's Acknowledged Duty to Keep PII Private**

31.      21st Century has acknowledged since March 26, 2013 in its Notice of Privacy

Practices[8] that it is required by law to maintain the privacy of the Data Breach victims' PII

and notify them if their PII was compromised in compliance with applicable law:

> **Our Responsibilities**
> We are required by law to maintain the privacy of your protected health information, to provide you with notice of our legal duties and privacy practices with respect to that protected health information, and to notify any affected individuals following a breach of any unsecured protected health information.  We will abide by the terms of the notice currently in effect.

It failed to do so.

**C.      21st Century's Knowledge that Thieves Seek the PII Entrusted to It**

**1.      The 2011-2012 Patient PII Data Breach**

32.      Unfortunately, despite the highly-sensitive nature of the data it handles, 21st

Century is no stranger to data breaches.

33.  On or about May 15, 2013, federal law enforcement officials informed 21st

Century that it was indicting one of its employees for having improperly accessed patient PII

over the course of almost ten months, between October 11, 2011 and August 8, 2012.  This

21st Century employee provided patient PII to a third party who used patient names, Social

Security numbers and dates of birth to file fraudulent claims for tax refunds.  As with the

recently announced Data Breach, 21st Century failed to detect the 2011-2012 data breach

itself.

---

[8] 21st Century, *Notice of Privacy Practices* (Mar. 26, 2013), available at https://www.21.co.com (last accessed Mar. 18, 2016).

34.     When 21st Century later notified the Maryland Attorney General of the 2011-2012 data breach on or about July 10, 2013, 21st Century had not yet concluded its own internal investigation into how the employee was able to access this information.

35.     Ultimately, 21st Century offered victims affected by the 2011-2012 data breach one year of credit monitoring and an assurance that "protecting our patients' personal information is a priority at 21st Century Oncology... and we take any potential misuse of our patients' private health information very seriously." [9]

36.     In the ensuing years, however, 21st Century did not carry through with its promises and only obtained—and thereby put at risk—far more patient data.

**2.      The increased threat to healthcare companies**

37.     According to cybersecurity company SANS Institute, healthcare providers and health insurance companies were regular targets of cyber-attacks, and were particularly vulnerable to them by October 2013.[10]

**3.      The FBI's highly publicized warning to healthcare companies**

38.     The FBI's cyber division warned health care systems in April 2014 that cyber-attacks were likely to further increase after January 2015, when healthcare companies were required to switch from using paper medical records to electronic records.  The FBI noted

---

[9] 21st Century, *Letter to Office of the Attorney General of Maryland* (July 10, 2013), available at https://www.oag.state.md.us/idtheft/Breach%20Notices/2013/itu-230673.pdf (last accessed Mar. 18, 2018), attached as exhibit B.

[10] SANS Institute, *Health Care Cyberthreat Report: Widespread Compromises Detected, Compliance Nightmare on Horizon* (Feb. 2014), available at http://www.sans.org/reading-room/whitepapers/analyst/health-care-cyberthreat-report-widespread-compromises-detected-compliance-nightmare-horizon-34735 (last visited Mar. 18, 2016).

that healthcare companies were more susceptible to cyber-attacks, making future attacks likely.[11]

39.    The FBI's report was highly publicized in 2014, being reported by such news agencies as Reuters.[12]

40.    Yet, 21st Century appears not to have heeded these warnings to reasonably and adequately secure this private and highly sensitive PII, as demonstrated by its failure to learn of the recently disclosed Data Breach until the FBI (again) reported it to 21st Century.  As Twistlock's chief strategy officer Chenxi Wang told *ESecurity Planet:*

> The fact that many of these breaches are reported by the FBI, rather than discovered by the company that holds the data, speaks to the heart of the problem—many organizations do not have sufficient technical expertise and capabilities in place to protect data and respond in a timely manner in the event of a breach[.][13]

**D.    21st Century's Marked History of Prioritizing Profit Over Patients**

41.    The Data Breach should be viewed in the context of the corporate culture in which it arose.  Contrary to its stated commitment on its website to provide "compassionate" cancer care to patients,[14] 21st Century, through its wholly-owned subsidiaries, has been subjecting patients to a variety of unnecessary medical testing for at least seven years.

---

[11] FBI Cyber Division Private Industry Notification, April 8, 2014, available at
https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf (last visited Mar. 18, 2016).

[12] Finkle, *Exclusive: FBI Warns Healthcare Sector Vulnerable to Cyber Attacks*, Reuters, April 23, 2014, available at http://www.reuters.com/article/2014/04/23/us-cybersecurity-healthcare-fbi-exclusividUSBREA3M1Q920140423 (last visited Mar. 18, 2016).

[13] Jeff Goldman, *21st Century Oncology Notifies 2.2 Million Patients of Data Breach* (Mar. 11, 2016), available at http://www.esecurityplanet.com/network-security/21st-century-oncology-notifies-2.2-million-patients-of-data-breach.html (last accessed Mar. 18, 2016).

[14] 21st Century, Home Page, available at https://www.21co.com (last visited Mar. 18, 2016).



### 1.    The 2008-2012 unnecessary testing of patients

42.    On March 25, 2013—two months before the FBI informed 21st Century of the 2011-2012 data breach—a medical assistant filed a whistleblower suit against a 21st Century subsidiary alleging a scheme to subject patients to unnecessary tests in order to fraudulently collect money from federal health care programs from 2008 through 2012.[15]

43.    In the words of Special Agent in Charge Shimon Richmond of the Department of Health and Human Services Office of Inspector General: "These tests were ordered to increase profits, not improve the health care of patients."[16]

44.    On December 16, 2015—one month after the FBI informed 21st Century of the recently disclosed Data Breach—21st Century filed an SEC Form 8-K that announced that it was settling the whistleblower suit for $19.75 million.[17]

---

[15] *United States, State of Florida, ex rel. Mariela Barnes, v. Dr. David Spellberg, 21 Century Oncology and Naples Urology Associates*, Civil Action No. 2:13-cv-228-FtM-99DNF (M.D. Fla.).

[16] Don Browne, *21st Century Oncology Paying $19 Million Settlement In False Billing Case*, Southwest Florida Online (Dec. 18, 2015), available at http://swflorida.blogspot.com/2015/12/21st-century-oncology-paying-19-million.html (last visited Mar. 18, 2016)

[17] 21st Century SEC Form 8-k (Dec. 16, 2015), available at https://www.21co.com/investors/sec-filings (last visited Mar. 18, 2016).

### 2.     The 2009-2015 additional unnecessary testing of patients

45.     On October 19, 2015—less than a month before the FBI informed 21st

Century of the instant Data Breach—a doctor filed a whistleblower suit against a 21st Century

subsidiary alleging a scheme to subject patients to four categories of unnecessary tests in

order to fraudulently collect money from federal health care programs from 2009 through

2014.[18]

46.     "The company prioritized profit over medical counsel," said David L. Scher,

counsel for the whistleblowing doctor.[19]

47.     Jason Mehta, Assistant U.S. Attorney agreed, stating: "When medical

decision-making is influenced by significant financial incentives, patients suffer—and, in this

case, patients and taxpayers were bilked for a test of questionable validity that the

government contends, in some cases, offered no value or meaning to any healthcare

practitioners."[20]

48.     On March 9, 2016—days after publicly disclosing the Data Breach—21st

Century filed an SEC Form 8-K that announced that it was settling the second whistleblower

suit for $34.7 million.[21]

---

[18] *United States ex rel. Joseph Ting v. 21st Century Oncology and South Florida Radiation Oncology*, Civil Action No. 3:14-cv-723-Jax-J32JRK (M.D. Fla).

[19] Patricia Brooks, *Medicare Fraud Whistleblower Represented By The Employment Law Group® Law Firm Wins $34.7 Million Settlement In Case Against 21st Century Oncology*, PR Newswire (Mar. 8, 2016), available at http://www.prnewswire.com/news-releases/medicare-fraud-whistleblower-represented-by-the-employment-law-group-law-firm-wins-347-million-settlement-in-case-against-21st-century-oncology-300232646.html (last visited Mar. 18, 2016).

[20] *Id.*

[21] 21st Century SEC Form 8-K (Mar. 9, 2016), available at https://www.21co.com/investors/sec-filings (last visited Mar. 18, 2016).

### 3.     21st Century Scuttles Its December 10, 2013 Confidential Initial Public Offering

49.     When 21st Century realized that it was going to have to answer for its years of subjecting patients to unnecessary tests for profit, it quietly began efforts to shift its liability for these misdeeds by confidentially filing an initial public offering on December 10, 2013.[22]

50.     According to equity analyst Kris Tuttle, 21st Century pitched a fairly simple growth by acquisition story to investors:

> The investment story is fairly simple - cancer is a large and growing problem that requires treatment. We are the biggest and best option and will continue to grow by acquisition.[23]

51.     21st Century, postponed its IPO on May 22, 2014, however, citing poor market conditions.[24]

52.     Analyst Tuttle noted that the reason 21st Century was only getting limited interest in the IPO in May 2014 was that its balance sheet included debt it was looking to restructure.

53.     If the deal failed to get done, analyst Tuttle suggested that the company go back to the drawing board and focus the growth and the story:

> If the deal fails to get done we'd send this company back to the drawing board and focus the growth and the story more on technology-driven improvements in transparency, cost efficiency and higher quality of care. Right now the positioning is

---

[22] Renaissance Capital, *21st Century Oncology postpones IPO,* Nasdaq (May 22, 2014), available at http://www.nasdaq.com/article/21st-century-oncology-postpones-ipo-cm355444 (last visited Mar. 18, 2016).

[23] Kris Tuttle, *Tepid Demand for 21st Century Oncology IPO,* IPO Candy (May 22, 2014), available at https://ipocandy.com/2014/05/tepid-demand-for-21st-century-oncology-ipo/ (last visited Mar. 18, 2016).

[24] Renaissance Capital, *21st Century Oncology postpones IPO,* Nasdaq (May 22, 2014), available at http://www.nasdaq.com/article/21st-century-oncology-postpones-ipo-cm355444 (last visited Mar. 18, 2016).

"we're a little better than a hospital-based center on average and we can buy up centers in a fragmented market."[25]

54.     21st Century appears to have taken the "form" of analyst Tuttle's suggestion to heart, stating in its annual report for the year ended December 31, 2014:

> Given the changing healthcare landscape, increased focus on lower cost, higher quality care and the potential for value-based reimbursement, we built a complete and integrated cancer care platform to better meet the needs of patients, physicians and payers.[26]

55.     Ultimately, however, 21st Century was forced to disclose to investors in its December 18, 2015 8-K filing that it was settling the first whistleblower's allegations that 21st Century had been subjecting its patients to unnecessary testing for short-sighted profits for $19.75 million—which was incompatible with the "substance" of analyst Tuttle's suggestion.[27]

56.     The last nail in the coffin for 21st Century's proposed IPO occurred two weeks later, on January 5, 2016, when the *Wall Street Journal* reported that 21st Century had withdrawn its long-delayed IPO after recently agreeing "to pay $19.75 million to settle civil allegations by the Justice Department that its doctors performed the test on Medicare patients more often than medically necessary" and also talking with the Justice Department about setting "a second investigation into its use of a radiation-oncology procedure."[28]

---

[25] Kris Tuttle, *Tepid Demand for 21st Century Oncology IPO,* IPO Candy (May 22, 2014), available at https://ipocandy.com/2014/05/tepid-demand-for-21st-century-oncology-ipo/ (last visited Mar. 18, 2016).

[26] 21st Century SEC Form 10-K (Mar. 27, 2015), available at https://www.21co.com/investors/sec-filings (last visited Mar. 18, 2016).

[27] 21st Century SEC Form 8-k (Dec. 16, 2015), available at https://www.21co.com/investors/sec-filings (last visited Mar. 18, 2016).

[28] Chelsey Dulaney and John Carreyrou, *21st Century Oncology Withdraws IPO: Cancer-care giant was recently embroiled in Medicare billing investigation,* Wall St. J. (Jan. 5, 2016), available at http://www.wsj.com/articles/21st-century-oncology-withdraws-ipo-1452033845 (last visited Mar. 18, 2016).

**E.     21st Century's Continued Prioritization of Profits Over Patients Injures Data Breach Victims**

**1.     The obfuscation of key facts about the Data Breach**

57.     While 21st Century failed to detect compromises of private and sensitive PII entrusted to its care at least twice, placed profits over patient care for years, and only notified Data Breach victims that their private and highly sensitive PII had been compromised five months after it occurred, 21st Century asserts that it can now be trusted to act in their interests and protect their PII.   Again, its actions suggest otherwise.

58.     Despite having had months to prepare its notification to Data Breach victims, 21st Century informed Data Breach victims only that an intruder "may have accessed its database that contained patient names, Social Security numbers, physicians' names, diagnoses and treatment information, and insurance information," and suggested that Data Breach Victims should be comforted because *it* found "no evidence that patients' medical records were accessed."[29]

59.     James Chappell, Digital Shadows' CTO and co-founder, expressed surprise at 21st Century's callous and calculating description of the scope of this breach, particularly given the known life circumstances of these Data Breach victims, stating:

> The circumstances in these patients' lives were already pretty tough ... I'm surprised 21st Century Oncology weren't better stewards of their patients' data given their circumstances.[30]

---

[29] 21st Century SEC Form 8-K (Mar. 4, 2016), available at https://www.21co.com/investors/sec-filings (last visited Mar. 18, 2016).

[30] Tom Spring, *Cancer Clinic Warns 2.2 Million Patients of Records Breach,* (Mar. 8, 2016), available at https://threatpost.com/cancer-clinic-warns-2-2-million-patients-of-records-breach/116668/ (last accessed Mar. 18, 2016).

60.     Ted Harrington, executive partner with Independent Security Evaluators,

likewise believes that 21st Century's response is off base, stating:

> 21st Century Oncology's response really misses the mark. … patient names, Social
> Security numbers and other data … are some of the most important aspects of the
> medical record.[31]

61.     Senior HHS advisor Rachel Seeger has similarly been quoted in the media

emphasizing that names and Social Security Numbers are protected under HIPAA—even if

no specific diagnostic or treatment information is disclosed as it was here:

> The personally identifiable information that HIPAA-covered health plans maintain on
> enrollees and members — including names and Social Security Numbers — is
> protected under HIPAA, even if no specific diagnostic or treatment information is
> disclosed.[32]

**2.     The risk of identity theft is a major concern to Data Breach victims**

62.     Hackers steal such PII in order to sell it on black market sites to identity

thieves[33] who intend to get their money's worth out of it and use it.

63.     It is telling that 21st Century offered one year of credit monitoring and

identity-theft protection to 2.2 million people in its database after the FBI informed it that

patient information was illegally obtained by a third party in October 2015.

64.     It costs 21st Century more than a *de minimis* amount to provide these services

to 2.2 million data breach victims.

---

[31] Paul Benjou, *Negligence is the Cancer of CyberCrime,* (Mar. 2016), available at
http://myopenkimono.blogspot.com/2016/03/negligence-is-cancer-of-cyber-crime.html (last accessed Mar. 18,
2016)

[32] Elizabeth Weise, *Anthem Fined $1.7 million in 2010 breach,* (Feb. 5, 2015), available at
http://www.usatoday.com/story/tech/2015/02/05/anthem-health-care-computer-security-breach-fine-17-
million/22931345/ (last accessed Mar. 18, 2016)

[33] Ozzie Fonseca, *Following Personal Identifying Information (PII) Down the Black Net Road,* Experian (Aug.
11, 2015), available at http://www.experian.com/blogs/data-breach/2015/08/11/following-personal-
identifying-information-pii-down-the-black-net-road/ (last visited Mar. 18, 2016).

65.     Indeed, Experian is currently charging $4.95 a month for the first month, and then $19.95 per month thereafter.[34]

66.     21st Century did so because the risk of identity theft to the Data Breach victims is not ephemeral and cannot be safely disregarded.

67.     Rather, there is a strong likelihood that 21st Century victims are already or will become victims of identity fraud given the breadth of information about them that has been taken by hackers.

68.     As reported by Javelin Strategy & Research's 2014 Identity Fraud Study:

Data breaches are the greatest risk factor for identity fraud. … In 2013, one in three consumers who received notification of a data breach became a victim of fraud.[35]

**3.     The offered "remedy" is inadequate**

69.     21st Century has offered Data Breach victims twelve months of credit monitoring and identity theft insurance with ProtectMyID.com, an Experian product.

70.     Neither the credit monitoring nor the insurance can prevent identity theft or fraud, even for the twelve month period.

**a.     The offered remedies have required Data Breach victims to expend ongoing precious time containing their compromised PII**

71.     Credit monitoring is reactionary and only detects activity after identity thieves use compromised PII to attempt to fraudulently open lines of credit.

---

[34] Experian, *Credit Monitoring*, available at http://www.experian.com/consumer-products/credit-monitoring.html (lasted visited Mar. 18, 2016).

[35] 2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters, (Feb. 20, 2013), *available at* https://www.javelinstrategy.com/coverage-area/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last accessed Mar. 18, 2016).

72.    Identity theft insurance similarly only reimburses losses after they have occurred.

73.    Neither of these services prevent identity theft or fraud by: (i) detecting sales of Social Security numbers, medical information and other PII on underground black market websites before the PII is used to commit identity theft or identity fraud; (ii) monitoring public records, loan data, or criminal records; (iii) flagging existing accounts for fraud in order to thwart identity thieves' use of compromised PII before an unauthorized transaction can be completed; or (iv) freezing credit, which prevents identity thieves' ability to open new accounts with compromised PII.

74.    Accordingly, reports have stated that 21st Century has recommended that Data Breach victims monitor their explanation of benefits statements to detect and resolve unauthorized charges without its help.  As reported by *News-Press.com:*

> "We also recommend that patients regularly review the explanation of benefits that they receive from their health insurer," the letter to patients states. "If they see services that they did not receive, please contact the insurer immediately." [36]

75.    Also amongst the recommendations in the ProtectMyID attachment to 21st Century's Data Breach notification letter to victims, is that they act on their own by: (a) "reviewing your credit card, bank, and other financial statements for any unauthorized activity;" (b) obtaining "a copy of your credit report … directly from each of the three nationwide credit reporting agencies;" and (c) contacting "the Federal Trade Commission and/or the Office of the Attorney General in your home state" if Data Breach victims believe

---

[36] Frank Gluck, *Data breach affects 2.2M 21st Century Oncology patients,* News-Press.com (Mar. 10, 2016), available at http://www.news-press.com/story/news/2016/03/09/data-breach-affects-22m-21st-century-onoclogy-patients/81525656/ (last visited Mar. 18, 2016).

that they have become "a victim of identity theft or have reason to believe your personal information has been misused." [37]

76.     These tasks are significant burdens to ask of anyone who has entrusted PII to another to assume, and it is particularly despicable for 21st Century to attempt to shift its responsibility to its oncology patients and their loved ones.

> **b.     Thieves will likely use Data Breach victim's PII to hurt them far longer than a year**

77.     While identity thieves historically sought short-term profit from hacked credit card numbers, hackers today are targeting non-financial information so they can "continue to monetize victims' identifies over a longer period of time."[38]  As observed by Gemalto vice president and CTO for data protection Jason Hart,

> In 2014, consumers may have been concerned about having their credit card numbers stolen, but there are built-in protections to limit the financial risks … However, in 2015 criminals shifted to attacks on personal information and identity theft, which are much harder to remediate once they are stolen. [39]

78.     This truth is notably acknowledged in the ProtectMyID attachment[40] to 21st Century's notification letter to Data Breach victims, which states:

> It is recognized that identity theft can happen months and even years after a data breach.

---

[37] 21st Century, *Letter to Office of the Attorney General of New Hampshire* (March 4, 2016), available at http://doj.nh.gov/consumer/security-breaches/documents/21st-century-oncology-20160304.pdf (last visited Mar. 18, 2018), attached as exhibit A.

[38] How to Spot and Prevent Medical Identity Theft (Aug. 19, 2014) *available at* http://www.creditcards.com/credit-card-news/spot-prevent-medical-identity-theft-1282.php (last accessed Mar. 18, 2016)

[39] Jeff Goldman, *21st Century Oncology Notifies 2.2 Million Patients of Data Breach* (Mar. 11, 2016), available at http://www.esecurityplanet.com/network-security/21st-century-oncology-notifies-2.2-million-patients-of-data-breach.html (last accessed Mar. 18, 2016).

[40] 21st Century, *Letter to Office of the Attorney General of New Hampshire* (March 4, 2016), available at http://doj.nh.gov/consumer/security-breaches/documents/21st-century-oncology-20160304.pdf (last visited Mar. 18, 2018), attached as exhibit A.

(i)     **Compromised Social Security numbers have long-term value to thieves and long-term consequences to Data Breach victims**

79.     Neal O'Farrell, a security and identity theft expert for Credit Sesame calls a Social Security number "your secret sauce," that is "as good as your DNA to hackers."[41]

80.     Unfortunately, Data Breach victims have to wait until they become victims of Social Security number misuse before they can obtain a new one.

81.     Even then, the Social Security Administration warns "that a new number probably will not solve all [] problems . . . and will not guarantee . . . a fresh start."  In fact, "[f]or some victims of identity theft, a new number actually creates new problems."[42]  One of those new problems is that a new Social Security number will have a completely blank credit history, making it difficult to get credit for years unless it is linked to the old compromised number.

(ii)    **Compromised medical information has even greater long-term value to thieves and consequences to Data Breach victims**

82.   Kunal Rupani, director of product management at Accellion, told *eSecurity Planet* that it's likely the 21st Century hackers were targeting the Data Breach victims' healthcare data for its long-term value, stating:

> "Unlike credit card numbers and other financial data, healthcare information doesn't have an expiration date," he said. "As a result, a patient's records can sell on the black market for upwards of fifty times the amount of their credit card number,

---

[41] How to Protect Your Kids From the Anthem Data Breach, (Feb. 10, 2015), *available at* http://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html#  (last accessed Mar. 18, 2016)

[42] Identity Theft and Your Social Security Number, a*vailable at* https://www.ssa.gov/pubs/EN-05-10064.pdf at pgs. 6-7 (last accessed Mar. 18, 2016)

making hospitals and other healthcare organizations extremely lucrative targets for cybercriminals."[43]

83.     According to a study by Dell SecureWorks, when such medical information is "packaged with other PII can net a seller more than $1,000 for each package."[44]

84.     Once hackers have a medical ID, they can use it to procure prescription drugs, expensive medical equipment, or simply to commit financial fraud—often for months or years before the Data Breach victim or anyone else notices."[45]

85.     Once use of compromised non-financial PII is detected, the emotional and economic consequences to the Data Breach victim is significant.  As reported by CreditCards.com:

> The Ponemon Institute found that 36 percent of medical ID theft victims pay to resolve the issue, and their out-of-pocket costs average nearly $19,000.  Even if you don't end up paying out of pocket, such usage can wreak havoc on both medical and credit records, and clearing that up is a time-consuming headache. That's because medical records are scattered.  Unlike personal financial information, which is consolidated and protected by credit bureaus, bits of your medical records end up in every doctor's office and hospital you check into, every pharmacy that fills a prescription and every facility that processes payments for those transactions.[46]

86.     Furthermore, the Office of Inspector General of the U.S. Department of Health & Human Services has cautioned that the consequences to Data Breach victims can also be medically disastrous:

---

[43] Jeff Goldman, *21st Century Oncology Notifies 2.2 Million Patients of Data Breach* (Mar. 11, 2016), available at http://www.esecurityplanet.com/network-security/21st-century-oncology-notifies-2.2-million-patients-of-data-breach.html (last accessed Mar. 18, 2016).

[44] Following Personal Identifying Information (PII) Down the Black Net Road, (Aug. 11, 2015), *available at* http://www.experian.com/blogs/data-breach/2015/08/11/following-personal-identifying-information-pii-down-the-black-net-road/  (last accessed Mar. 18, 2016)

[45] How to Spot and Prevent Medical Identity Theft (Aug. 19, 2014) *available at* http://www.creditcards.com/credit-card-news/spot-prevent-medical-identity-theft-1282.php (last accessed Mar. 18, 2016)

[46] *Id.*

The damage can be life-threatening to you if the wrong information ends up in your personal medical records.[47]

### 4.     The delayed disclosure further harmed Data Breach victims

87.     In the intervening months between when the FBI notified 21st Century of the Data Breach and when 21st Century disclosed it to Data Breach victims, 21st Century focused *not* on protecting patients and others whose PII 21st Century collected and retained, but rather on controlling the damage to itself and its investors.

88.     On information and belief, despite having months to prepare notification letters for the Data Breach victims after being notified of it by the FBI, 21st Century waited a week after announcing the Data Breach to its investors on March 4, 2016 to mail notification letters to Data Breach victims.

89.     When Data Breach victims began receiving the notification letters from 21st Century on or about March 12, 2016, some of them did not understand that they had a relationship with 21st Century and believed the notification letters themselves to be a scam.

90.     Indeed, as of March 18, 2016, it is not obvious to a Data Breach victim looking to confirm the authenticity of the notification letter through 21st Century's website that there has been a data breach.  While a single line, "A Message to Our Patients Regarding Security Incident" appears on the home page of 21st Century's website, it does not prominently appear at the top or bottom of the screen, and is masked amongst other text and images on the elongated home page that requires one to scroll to reach the bottom:

---

[47] Medical ID Theft/Fraud Information, *available at* http://oig.hhs.gov/fraud/medical-id-theft/ (last accessed Mar. 18, 2016)



91.     Other Data Breach victims who were unfamiliar with the name "21st Century Oncology," were left to play detective to ascertain which physicians they have seen, if any, were associated with 21st Century.

92.     In addition, the notification letters that 21st Century ultimately mailed to Data Breach victims failed to provide concrete information about the Data Breach, and incompletely described what PII was in fact exposed, how it was exposed, and what changes 21st Century was making to prevent further compromises of PII in the future.

93.     Making matters worse, Data Breach victims have felt blindsided by the notification that their Social Security numbers were accessed with only weeks remaining before the tax filing deadline and have found activating the monitoring service to be

confusing and time consuming, thereby increasing their anxiety that the Data Breach would potentially jeopardize any expected tax refund.

94.     Accordingly, 21st Century's delayed and insufficient response to the Data Breach created additional hardships for these Data Breach victims during an already medical and financial stressful time.

## F.     21st Century's Priorities Have Caused Plaintiff's Most Sensitive PII to Be Compromised, Increasing His Current and Ongoing Suffering

95.     On or about March 17, 2016, Plaintiff Robert Russell received a notice from 21st Century ("Data Breach Notice"), which indicated that the FBI had advised 21st Century that its patient information had been illegally obtained by an unauthorized third party.

96.     The Data Breach Notice indicated that the unauthorized third party may have accessed a database that contained his, as well as other patients': names; Social Security numbers; treating provider names; diagnoses and treatment information; and insurance information.

97.     Plaintiff was shocked by this news and took immediate steps to further investigate how to contain the use of his compromised PII in the midst of his ongoing oncology care.

98.     On or about March 17, 2016, Plaintiff telephoned 21st Century's call center to express his concern and to learn how he could contain the impact of 21st Century's Data Breach on his PII.  The call center representative responded by stating that the representative would send Plaintiff a packet of material in seven to ten days, which Plaintiff could complete in order to obtain a one-year membership of Experian's ProtectMyID Alert.

99.     On or about March 21, 2016, Plaintiff telephoned the Federal Trade Commission seeking to confirm that the data breach notification letter that he received from 21st Century was authentic.

100.    On or about March 22, 2016, Plaintiff telephoned his medical insurer to alert it to the 21st Century Oncology data breach.

101.    Plaintiff anticipates spending considerable time and money indefinitely to contain the impact of 21st Century's Data Breach on Plaintiff's compromised PII and believes one year of credit monitoring offered by 21st Century through a single credit reporting agency, without any type of monitoring of medical or tax records, to be insufficient.

## VI.    CLASS ACTION ALLEGATIONS

102.    Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class of similarly situated persons, which Plaintiff initially proposes to be defined as follows:

> All persons in the United States whose PII was compromised as a result of the Data Breach.

103.    **Numerosity.**  The proposed Class is sufficiently numerous, as 2.2 million Data Breach victims have had their PII compromised and they are dispersed throughout the United States, making joinder of all members impracticable.  Class members can be readily identified by records maintained by 21st Century.

104.    **Commonality.**  Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual class members, including:

a.      Whether 21st Century had a legal duty to use reasonable security measures to protect Class members' PII;

b.  Whether 21st Century timely, accurately, and adequately informed Class members that their PII had been compromised;

c.  Whether 21st Century breached its legal duty by failing to protect Class members' PII;

d.  Whether 21st Century acted reasonably in securing Class members' PII;

e.  Whether Class members are entitled to actual damages and/or statutory damages; and

f.  Whether Class members are entitled to injunctive relief.

105.    **Typicality.**  Plaintiff's claims are typical of the claims of members of the proposed Class because, among other things, Plaintiff and Class members sustained similar injuries as a result of 21st Century's uniform wrongful conduct and their legal claims all arise from the same conduct by 21st Century.

106.    **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the proposed Class.  Plaintiff's interests do not conflict with Class members' interests and he has retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Class.

107.    **Rule 23(b)(3).**  In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual class members and a class action is superior to individual litigation.  The amount of damages available to individual plaintiffs is insufficient to make litigation addressing 21st Century's

conduct economically feasible in the absence of the class action procedure.  Individualized

litigation also presents a potential for inconsistent or contradictory judgments, and increases

the delay and expense to all parties and the court system presented by the legal and factual

issues of the case.  By contrast, the class action device presents far fewer management

difficulties and provides the benefits of a single adjudication, economy of scale, and

comprehensive supervision by a single court.

108.    **Rule 23(b)(2).**  Plaintiff also satisfies the requirements for maintaining a class

action under Rule 23(b)(2).  21st Century has acted or refused to act on grounds that apply

generally to the proposed Class, making final declaratory or injunctive relief appropriate with

respect to the proposed Class as a whole.

109.    **Rule 23(c)(4).**  This action also satisfies the requirements for maintaining a

class action under Rule 23(c)(4).  The claims of Class members are composed of particular

issues that are common to all Class members and capable of class wide resolution that will

significantly advance the litigation.

## VII.    CAUSES OF ACTION

### COUNT I:
### Negligence

110.    Plaintiff realleges and incorporates by reference the allegations contained in

each of the preceding paragraphs as if fully set forth herein.

111.    In collecting and retaining the medical and other PII of patients and other Data

Breach victims, 21st Century owed Plaintiff and Class members a duty to exercise reasonable

care in safeguarding and protecting that information.  This duty included, among other

things, maintaining and testing 21st Century's security systems and taking other reasonable

security measures to protect and adequately secure the PII of Plaintiff and class members from unauthorized access.

112.     21st Century's security system and procedures for handling the medical and other PII of victims were intended to and did affect Plaintiff and Class members.  21st Century knew that by collecting and storing victims' private and sensitive medical and other PII, it undertook a responsibility to take reasonable security measures to protect the information from being stolen and exposed to unauthorized persons.

113.     21st Century owed a duty of care to Plaintiff and Class members because they were foreseeable and probable victims of any inadequate security practices.  It was foreseeable that if 21st Century did not take reasonable security measures, the PII of Plaintiff and members of the Class would be stolen.  Major corporations like 21st Century face a higher threat of security breaches than smaller companies due in part to the large amounts of data they possess.  21st Century knew or should have known its security systems were inadequate, particularly in light of the prior data breach that 21st Century experienced, and yet 21st Century failed to take reasonable precautions to safeguard the PII of patients and other Data Breach victims.

114.     The duty 21st Century owed to Plaintiff and members of the Class to protect their PII is also underscored by Fla. Stat. § 501.171(2), the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. §1320d *et. seq.,* and the Health Information Technology Act ("HITECH Act"), 42 U.S.C. § 17901, *et seq.*, which recognize the importance of maintaining the confidentiality of personal and medical information and were

enacted to protect individuals from the unauthorized exposure of their personal and medical information.

115.    21st Century also had a duty to timely disclose to Plaintiff and Class members that their PII had been or was reasonably believed to have been compromised.  Timely disclosure was necessary so that Plaintiff and members of the Class could, among other things: (i) buy identity protection, monitoring, and recovery services; (ii) flag asset, credit, and tax accounts for fraud, including reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the Internal Revenue Service; (iii) purchase or otherwise obtain credit reports; (iv) monitor credit, financial, utility, explanation of benefits, and other account statements on a monthly basis for unrecognized credit inquiries, Social Security numbers, home addresses, charges, and/or medical services; (v) place and renew credit fraud alerts on a quarterly basis; (vi) routinely monitor public records, loan data, or criminal records; (vii) contest fraudulent charges and other forms of criminal, financial and medical identity theft, and repair damage to credit and other financial accounts; and (viii) take other steps to protect themselves and recover from identity theft and fraud.

116.    As a result of 21st Century's negligence, Plaintiff and members of the Class have suffered and will suffer injury, including but not necessarily limited to: (1) the loss of the opportunity to control how their PII is used; (2) the diminution in the value and/or use of their PII; (3) the compromise, publication, and/or theft of their PII; (4) out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of medical accounts; (5) lost opportunity costs associated with effort expended and the loss of productivity from addressing and attempting to mitigate the actual

and future consequences of the breach, including but not limited to efforts spent researching

how to prevent, detect, contest and recover from identity and health care/medical data

misuse; (6) costs associated with the ability to use credit and assets frozen or flagged due to

credit misuse, including complete credit denial and/or increased costs to use credit, credit

scores, credit reports and assets; (7) unauthorized use of compromised PII to open new

financial and/or health care or medical accounts; (8) tax fraud and/or other unauthorized

charges to financial, health care or medical accounts and associated lack of access to funds

while proper information is confirmed and corrected; (9) the continued risk to their PII,

which remains in 21st Century's possession and is subject to further breaches so long as 21st

Century fails to undertake appropriate and adequate measures to protect the PII in its

possession; and (10) future costs in terms of time, effort and money that will be expended, to

prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data

Breach for the remainder of the lives of the Class members.

117.    As a result of 21st Century's negligence, Plaintiff and members of the Class

have suffered and will suffer injury, including but not necessarily limited to: (1) anxiety,

stress and emotional distress; (2) the loss of the opportunity to control how their PII is used;

(3) the diminution in the value and/or use of PII entrusted to 21st Century for the purpose of

deriving medical care, when Plaintiff and Class members understood that their PII would be

safeguarded against unauthorized use; and (4) the compromise, disclosure and/or sale of their

PII.

118.    There is a very close connection between 21st Century's failure to employ

reasonable security protections of patient and other Data Breach victims' PII and the injuries

suffered by Plaintiff and Class members.  When individuals have their PII stolen, they are at risk for identity theft, and need to: (i) buy identity protection, monitoring, and recovery services; (ii) flag asset, credit, and tax accounts for fraud, including reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the Internal Revenue Service; (iii) purchase or otherwise obtain credit reports; (iv) monitor credit, financial, utility, explanation of benefits, and other account statements on a monthly basis for unrecognized credit inquiries, Social Security numbers, home addresses, charges, and/or medical services; (v) place and renew credit fraud alerts on a quarterly basis; (vi) routinely monitor public records, loan data, or criminal records; (vii) contest fraudulent charges and other forms of criminal, financial and medical identity theft, and repair damage to credit and other financial accounts; and (viii) take other steps to protect themselves and recover from identity theft and fraud.

119.    21st Century is responsible for not protecting the PII of its patients and other Data Breach victims.  If 21st Century had reasonable security measures in place, data thieves would not have been able to steal and expose the PII of millions of patients and other Data Breach victims.

120.    The policy of preventing future harm weighs strongly in favor of finding a special relationship between 21st Century and its patients and other Data Breach victims. Patients and other Data Breach victims were required to share private and sensitive medical and/or other PII with 21st Century as a condition of receiving medical care and depended on 21st Century as a medical provider to ensure that this information was protected from theft and unauthorized disclosure.  If companies are not held accountable for failing to take

reasonable security measures to protect this PII, they will not take the steps that are necessary to protect against future data breaches.

121.    21st Century breached its duty to exercise reasonable care in protecting the PII of Plaintiff and the Class by failing to implement and maintain adequate security measures to safeguard this PII, failing to monitor its systems to identify suspicious activity, and allowing unauthorized access to the PII of Plaintiff and Class members.

122.    21st Century breached its duty to timely notify Plaintiff and the Class about the Data Breach.  21st Century waited months after discovering the Data Breach, and five months after the actual breach, to inform victims that their PII had been or was reasonably believed to have been compromised.

123.    But for 21st Century's failure to implement and maintain adequate security measures to protect victims' PII and failure to monitor its systems to identify suspicious activity, the PII of Plaintiff and Class members would not have been compromised, Plaintiff and Class members would not have been injured, and Plaintiff and Class members would not be at a heightened risk of identity theft in the future.

124.    21st Century's negligence was a substantial factor in causing harm to Plaintiff and Class members.  As a direct and proximate result of 21st Century's failure to exercise reasonable care and use commercially reasonable security measures, the PII of patients and other Data Breach victims was accessed by unauthorized individuals who can continue to use this compromised PII to commit identity theft and identity and health care and/or medical fraud indefinitely.

125.    As a result of 21st Century's negligence, Plaintiff and the Class members suffered and will continue to suffer injury and/or harm including, but not limited to anxiety, stress, emotional distress, loss of privacy, loss of control over their PII, and other economic and non-economic losses.

126.    As a result of 21st Century's negligence, Plaintiff and members of the Class are entitled to injunctive relief, including, but not limited to an order that 21st Century: (1) engage third party security auditors/penetration testers as well as internal security personnel to conduct testing consistent with prudent industry practices, including simulated attacks, penetration tests, and audits on 21st Century's systems on a periodic basis; (2) engage third party security auditors and internal personnel to run automated security monitoring consistent with prudent industry practices; (3) audit, test, and train its security personnel regarding any new or modified procedures; (4) purge, delete and destroy, in a secure manner, PII not necessary for its business operations; (5) conduct regular database scanning and securing checks consistent with prudent industry practices; (6) periodically conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach consistent with prudent industry practices; (7) receive periodic compliance audits by a third party regarding the security of the computer systems 21st Century uses to store PII; (8) meaningfully educate patients and other Data Breach victims about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves; and (9) provide ongoing identity theft protection, monitoring, and recovery services to Plaintiff and Class members.

127.     Plaintiff and the Class are also entitled to damages and reasonable attorneys' fees and costs.  Plaintiff also seeks reasonable attorneys' fees and costs under applicable law including Federal Rule of Civil Procedure 23.

## COUNT II:
### Breach of Implied Covenant of Good Faith and Fair Dealing

128.     Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

129.     Plaintiff and Class Members entered into and/or were the beneficiaries of contracts with 21st Century.

130.     These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual obligations (both explicit and fairly implied) and would not impair the rights of the other parties to receive their rights, benefits, and reasonable expectations under the contracts.  These included the covenants that 21st Century would act fairly, reasonably, and in good faith in carrying out their contractual obligations to protect the confidentiality of Plaintiff's and Class members' PII and to comply with industry standards and federal and state laws and regulations for the security of this information.

131.     Plaintiff and Class members who obtained and/or paid for medical care entrusted their sensitive PII to 21st Century.

132.     21st Century promised to take specific measures to protect Plaintiff's and Class members' PII.  21st Century breached the covenant of good faith and fair dealing by failing to take adequate measures to protect the confidentiality of Plaintiff's and Class Members' PII, resulting in the Data Breach.  21st Century unreasonably interfered with the

35

contract benefits owed to Plaintiff and Class members by: compiling and storing Plaintiff and Class members' data in one massive database; failing to implement reasonable and adequate security measures to protect and limit access to the PII in the database; and failing to implement reasonable auditing procedures to detect and halt the unauthorized extraction of data.

133.    Plaintiff and Class members performed all conditions, covenants, obligations, and promises owed to 21st Century, including paying for the medical care associated with 21st Century and/or providing 21st Century the confidential information required by the contracts.

134.    As a result of 21st Century's breach of the implied covenant, Plaintiff and Class members did not receive the full benefit of their bargain, and instead received medical care that was less valuable than what they paid for and less valuable than their reasonable expectations under the contracts.  Plaintiff and Class members were damaged in an amount at least equal to the difference in value between that which they reasonably expected under the contracts and 21st Century's partial, deficient and/or defective performance.

135.    In addition, as a result of 21st Century's breach of the covenant of good faith and fair dealing, Plaintiff and Class members have suffered actual damages resulting from their attempt to ameliorate the effect of the Data Breach and remain at imminent risk of suffering additional damages in the future.

136.    Accordingly, Plaintiff and Class members have been injured as a result of 21st Century's breaches of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

## COUNT III
### Violation of Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. §501.201, *et seq.*

137.    Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

138.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") was enacted to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

139.    Plaintiff and the Class are "consumers" as defined by Florida Statute §501.203(7), and the subject transactions are "trade or commerce" as defined by Florida Statute §501.203(8).

140.    21st Century violated and continues to violate the FDUTPA by engaging in the described unconscionable, deceptive, unfair acts or practices proscribed by Florida Statute §501.201, *et seq.,* including, but not limited to breaching its duty pursuant to Fla. Stat. § 501.171(2), to Plaintiff and Class members to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class members' PII by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII.

141.    Had Plaintiff and Class members known of 21st Century's inability to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and class members' PII they would not have obtained care through providers employed by or affiliated with 21st Century.

142.     By omitting the fact that 21st Century could not provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and class members' PII, 21st Century violated the FDUTPA.

143.     Plaintiff and the Class reasonably relied upon 21st Century's omissions in obtaining and/or paying for medical care from providers employed by or affiliated with 21st Century.

144.     Defendant's omissions regarding 21st Century's ability to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and class members' PII was an act likely to mislead Plaintiff and the members of the Class acting reasonably under the circumstances, and constitutes an unfair and deceptive trade practice in violation of the FDUTPA.

145.     Defendant knew or should have known that it had kept highly relevant and material information—namely, information regarding its inability to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and class members' PII—from its customers, and therefore violated the FDUTPA.

146.     As a direct and proximate result of Defendant's violation of the FDUTPA, Plaintiff and Class members have suffered harm in the form of monies paid to Defendant.

147.     Plaintiff and the Class also seek equitable relief and to enjoin Defendant on the terms that the Court considers reasonable.

148.     In addition, Plaintiff and the Class seek reasonable attorneys' fees and costs incurred in bringing this action.

## COUNT IV
### Declaratory Judgment

149.     Plaintiff realleges and incorporates by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

150.     As previously alleged, Plaintiff and the Class have stated claims against 21st Century based on negligence, and implied covenant of good faith and fair dealing, and violation of the FDUTPA.

151.     21st Century has failed to live up to its obligations to provide reasonable security measures for the PII of Plaintiff and the Class, as indicated by its corporate history of security breaches and the specific Data Breach that precipitated this lawsuit.

152.     In addition, the Data Breach has rendered 21st Century's system even more vulnerable to unauthorized access and requires that 21st Century immediately take even more stringent measures to currently safeguard the PII of Plaintiff and the Class going forward.

153.     An actual controversy has arisen in the wake of 21st Century's Data Breach regarding 21st Century's *current* obligations to provide reasonable data security measures to protect the PII of Plaintiff and the Class.  On information and belief, 21st Century maintains that its security measures were, and remain, reasonably adequate.  On information and belief, 21st Century further denies that it previously had or now has any obligation to better safeguard the PII of Plaintiff and the Class.

154.     Plaintiff thus seeks a declaration that to comply with its existing obligations, 21st Century must implement specific additional, prudent industry security practices, as outlined below, to provide reasonable protection and security to the PII of Plaintiff and the Class.

155.     Specifically, Plaintiff and the Class seek a declaration that 21st Century's existing security measures do not comply with its obligations, and that to comply with its obligations, 21st Century must implement and maintain reasonable security measures on behalf of Plaintiff and the Class, including, but not limited to: (1) engaging third party security auditors/penetration testers as well as internal security personnel to conduct testing consistent with prudent industry practices, including simulated attacks, penetration tests, and audits on 21st Century's systems on a periodic basis; (2) engaging third party security auditors and internal personnel to run automated security monitoring consistent with prudent industry practices; (3) auditing, testing, and training its security personnel regarding any new or modified procedures; (4) purging, deleting and destroying, in a secure manner, PII not necessary for its business operations; (5) conducting regular database scanning and securing checks consistent with prudent industry practices; (6) periodically conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach consistent with prudent industry practices; (7) receiving periodic compliance audits by a third party regarding the security of the computer systems 21st Century uses to store PII; (8) meaningfully educating patients and other Data Breach victims about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves; and (9) providing ongoing identity theft protection, monitoring, and recovery services to Plaintiff and class members, as well as their dependents and designated beneficiaries of employment-related benefits through 21st Century.

**COUNT V:**
**Unjust Enrichment**

156.    In the alternative, Plaintiff alleges that Plaintiff and the Class have no adequate remedy at law.

157.    Plaintiff and Class members conferred a monetary benefit on 21st Century in the form of money paid (directly or indirectly) to 21st Century for medical services obtained and/or provided their PII to 21st Century.

158.    21st Century appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class members.

159.    The money that Plaintiff and Class members paid (directly or indirectly) to 21st Century should have been used by 21st Century, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

160.    As a result of 21st Century's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between the medical care with the reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and the medical care without reasonable data privacy and security practices and procedures that they received.

161.    Under principles of equity and good conscience, 21st Century should not be permitted to retain the money belonging to Plaintiff and Class members because 21st Century failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiff and Class Members paid for and that were otherwise mandated by HIPAA and HITECH Act regulations, federal, state and local laws, and industry standards.

162.     21st Century should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds received by 21st Century.

163.     A constructive trust should be imposed upon all unlawful or inequitable sums received by 21st Century traceable to Plaintiff and Class members.

## VIII.   PRAYER FOR RELIEF

Plaintiff, on behalf of himself and on behalf of the proposed Classes, request that the Court:

a.     Certify this case as a class action, appoint Plaintiff as class representative, and appoint Plaintiff's counsel to represent the Class;

b.     Find that 21st Century breached its duty to safeguard and protect the PII of Plaintiff and the Class members that was compromised in the Data Breach;

c.     Award Plaintiff and Class members appropriate relief, including actual and statutory damages, restitution and disgorgement;

d.     Award equitable, injunctive and declaratory relief as may be appropriate;

e.     Award all costs, including experts' fees and attorneys' fees, and the costs of prosecuting this action;

f.     Award pre-judgment and post-judgment interest as prescribed by law; and

g.     Grant additional legal or equitable relief as this Court may find just and proper.

## IX.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:    March 29, 2016.

Respectfully submitted,

By: _____

Robert C. Gilbert
Florida Bar Number 561861
**KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT**
2525 Ponce de Leon Blvd., Suite 625
Coral Gables, FL  33134
Telephone: (305) 529-8858
Facsimile: (954) 525-4300
gilbert@kolawyers.com

David L. Ferguson
Florida Bar Number 981737
**KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT**
1 West Las Olas Blvd., 5th Floor
Ft. Lauderdale, FL  33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ferguson@kolawyers.com

Gretchen Freeman Cappio, *pro hac vice
    forthcoming*
Cari Campen Laufenberg, *pro hac vice forthcoming*
Amy N. L. Hanson, *pro hac vice forthcoming*
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
gcappio@kellerrohrback.com
claufenberg@kellerrohrback.com
ahanson@kellerrohrback.com

***Counsel for Plaintiff and the Proposed Class***